UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FRED D. BROUSSARD, § § | |
| Plaintiff, § | |
| VS. § § | |
| TEXAS DEPARTMENT OF CRIMINAL § JUSTICE, § § | |
| DON KEIL, Individually and in his § Capacity as Director of Religious § Programs, § § | |
| DON KASPAR, Individually and in his § Capacity as Director of Chaplaincy, § § | |
| BILLY PIERCE, Individually and in his § Capacity as Director of Chaplaincy, § § | CIVIL ACTION NO. H-04-1059 |
| MARK PICKETT, Individually and in his § Capacity as Chaplaincy Regional § Coordinator of Region III, § § | |
| WARDEN THOMAS MEDART, § Individually and in his Capacity as § Warden of Central Unit, TDCJ, § § | |
| BRENT LARSEN, in his Individual § Capacity, § § | |
| And § § | |
| JOHN STARLIPER, Individually and in § his Capacity as Lieutenant in the TDCJ § Security System, § § | |
| Defendants. § | |

**MEMORANDUM AND ORDER**

In this employment discrimination suit, Plaintiff Fred D. Broussard claims that his

employer, the Texas Department of Criminal Justice ("TDCJ"), along with various

1

individual TDCJ wardens, supervisors, and other employees, discriminated against Broussard on the basis of his race by harassing him, failing to respond to his complaints about coworkers, and finally transferring him from one TDCJ facility to another as part of a reduction in force ("RIF") caused by state budget cuts. All Defendants now move for summary judgment. After reviewing the parties' filings and the applicable law, the Court finds that Defendants' motion, Docket No. 57, should be and hereby is **GRANTED IN PART** and **DENIED IN PART**; Defendants Medart's and Starliper's motions to dismiss on jurisdictional grounds are **DENIED;** and summary judgment is **GRANTED** for all Defendants on all of Broussard's claims.

I.  BACKGROUND

Broussard, an African American male, began working as a volunteer TDCJ chaplain at the Central Unit in Sugar Land, Texas in 1985. In October 1996, he applied for, but was denied, a position as a paid chaplain. A few months later, however, in February 1997, the TDCJ did grant Broussard the paid position. At that time, Broussard was classified as a Chaplain I; he subsequently completed additional training and was promoted to Chaplain II. In the latter capacity, he developed and maintained spiritual programs for the prisoners housed in the Central Unit.

In June 2001, the TDCJ transferred Brent Larsen to the Central Unit. At the time of his transfer, Larsen, a Caucasian male, was classified as a Chaplain I; in 2003, he was promoted to Chaplain II. According to Broussard,[1] Larsen was disruptive from the very beginning of his tenure at the Central Unit, refusing to attend meetings, assist in administrative or planning tasks, or accept guidance from Broussard, the lead chaplain on

---

[1] For the purposes of Defendants' motion for summary judgment, the Court construes all contested factual issues in the light most favorable to Broussard, the non-movant. *See, e.g.*, *Minter v. Great Am. Ins. Co. of New York*, 423 F.3d 460, 465 (5th Cir. 2005).

2

the unit. On one occasion, Larsen allegedly shouted at Broussard and approached him in a threatening manner; after this incident, Larsen refused to speak to Broussard at all. Broussard also claims that Larsen was often absent for long periods during his scheduled shifts and was repeatedly found sleeping on the job. Broussard reported these problems to supervisors, including Defendant Thomas Medart, who was Warden of the Central Unit at the time of Larsen's transfer, and Defendant Mark Pickett, the Regional Chaplaincy Coordinator. As a result, prison authorities made several unsuccessful attempts to transfer Larsen to another TDCJ facility, and both Broussard and Larsen received counseling, during which Broussard was told that he must learn to work with Larsen.

Broussard also alleges that, beginning at about the same time as Larsen's arrival, Broussard began to experience hostile treatment from some of the Central Unit security guards, led by Defendant Lieutenant John Starliper. According to Broussard, Starliper and his guards interrupted Broussard's religious programs to conduct head counts of the prisoners and perform other security and scheduling tasks, and restricted the number and types of inmates who could work in the chapel. Broussard claims that he attempted to discuss these incidents with Starliper but that the problems persisted.

Broussard complained to management about the guards' behavior, filing employee grievances in October 2002, November 2002, and March 2003 against Starliper and several of his subordinates. The grievances did not mention racial discrimination; rather, they alleged that Starliper had violated TDCJ policies and inmates' rights and that Pickett had failed adequately to address these problems. The grievances were referred to dispute resolution, during which the parties reached agreements. Broussard alleges,

3

however, that those agreements were promptly breached by Starliper, Pickett, and the TDCJ. Broussard claims that the harassment by security and conflicts with Larsen caused him anxiety, distraction, declining physical health, and exhaustion.

In September 2002, TDCJ management conducted a performance audit that revealed Larsen's shortcomings. According to Broussard, however, the TDCJ declined to take action against Larsen, instead recommending again that the two chaplains try to get along. In November 2002, Medart left the Central Unit, and in February 2003, Defendant Terry Foster succeeded Medart as Warden. In June 2003, the TDCJ announced the RIF, which was the result of state budget cuts. Because the primary mandate of a prison is security, and because the TDCJ was already suffering from a shortage of security personnel, the TDCJ claims that it was forced to eliminate some chaplains' positions and to consolidate others. All facilities with more than one chaplain were subject to the RIF. Of 170 chaplaincy employees system-wide, 65 were terminated or transferred to non-chaplaincy programs in September 2003.

Broussard was not terminated or transferred to a non-chaplaincy program but was, instead, initially transferred to his 15th-choice facility, which was a 600-mile round-trip drive from his home. Broussard alleges that Defendants Don Keil, Director of Religious Programs, and Don Kaspar, Director of Chaplaincy, made the transfer decision. He also claims that, had Keil, Kaspar, Defendant Billy Pierce (Kaspar's successor as Director of Chaplaincy), Pickett, or Medart appropriately responded to Broussard's repeated complaints regarding Larsen's misconduct, Larsen would have been dismissed, thereby rendering the Central Unit a one-chaplain facility not subject to the RIF.

After Broussard complained about his transfer, he was offered, and accepted, a position at the Michael Unit, a facility in the vicinity of his 7th choice. The Michael Unit was a 300-mile round-trip drive from his home. Following the transfer, Foster forwarded three disciplinary charges against Broussard to the Warden of the Michael Unit. Those charges were eventually dismissed.

The RIF was conducted according to length of service within the chaplaincy program, so that those chaplains with the shortest tenures at TDCJ, notwithstanding whether they were classified as Chaplains I or Chaplains II, were terminated or transferred. The TDCJ contends that this approach was preferable to one based upon classification, because the latter method would have resulted in the loss of some of the most experienced chaplains, who had not attained Chaplain II status due to the lack of training facilities in their geographic areas. The TDCJ also argues that the impact upon African American chaplains, as a group, was not statistically significant, as compared to the effect upon Caucasian chaplains.

Broussard, however, claims that the RIF was racially discriminatory and, more specifically, that it targeted him for an arduous transfer while protecting his Caucasian co-chaplain. He contends that no Christian, African American chaplain affected by the RIF was assigned to one of the chaplain's top twelve choices, while, of the sixteen non-African American chaplains, eight were assigned to their first choices, five were granted their second, third, or fourth choice, and the remaining three were given their ninth, twelfth, and thirteenth choices, respectively. Broussard also argues that Foster's action, following the RIF, in forwarding the disciplinary charge to the warden of Broussard's new facility constituted retaliation for Broussard's earlier grievances.

Broussard filed discrimination and retaliation charges with the Equal Employment Opportunity Commission ("EEOC") on July 21, 2003 and received a right-to-sue letter on December 19, 2003. He filed this suit on March 17, 2004, alleging that the TDCJ engaged in racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and that the individual Defendants infringed his Fifth and Fourteenth Amendment rights to due process and equal protection, in violation of 42 U.S.C. § 1983. All Defendants now move for summary judgment.

## II.   ANALYSIS

### A.   Summary judgment standard

A motion for summary judgment brought pursuant to Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. *See* FED. R. CIV. P. 56(c). "Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir.), *cert. denied*, 534 U.S. 892 (2001) (internal quotation marks and citation omitted). A genuine issue of material fact exists "if the evidence is such that a reasonable jury could enter a verdict for the non-moving party." *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). This Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Id*.

### B.   The TDCJ's Motion for Summary Judgment

The TDCJ[2] contends that Broussard has failed to establish a *prima facie* case of Title VII discrimination, retaliation, or hostile work environment, and that he cannot rebut the TDCJ's asserted legitimate, non-discriminatory reason for his transfer. The TDCJ also asserts that Broussard cannot assert any Title VII claim arising from an act or incident occurring more than 300 days before the filing of his EEOC charge – that is, before September 21, 2002. Broussard argues that genuine factual issues preclude summary judgment and that, under certain circumstances, the Court can consider events occurring outside of the 300-day period in evaluating a hostile work environment claim. The Court evaluates each claim and argument in turn.

### 1. The Discrimination Claim

"Title VII prohibits employers from discriminating against employees on the basis of race, color, religion, sex, or national origin." *Grimes v. Texas Dep't of Mental Health*, 102 F.3d 137, 140 (5th Cir. 1996). Title VII claims are subject to the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

> *McDonnell Douglas* instructs that the plaintiff must first establish a *prima facie* case of [retaliation]. . . . Once the plaintiff presents a *prima facie* case, the defendant must then articulate a legitimate, nondiscriminatory reason for the questioned employment action. . . . If the defendant is able to do so, the burden shifts back to the plaintiff to produce evidence that the defendant's articulated reason is merely a pretext for discrimination.

*Frank v. Xerox Co.*, 347 F.3d 130, 137 (5th Cir. 2003). To establish a *prima facie* case of discrimination, a plaintiff must provide evidence that he "(1) is a member of a protected class; (2) was qualified for [his] position; (3) was subject to an adverse employment action; and (4) was replaced by someone outside the protected class, or, in the case of

---

[2] It is undisputed that Title VII cannot support a cause of action against the individual Defendants.

7

disparate treatment, shows that others similarly situated were treated more favorably." *Okoye v. Univ. of Texas Houston*, 245 F.3d 507, 512-13 (5th Cir. 2001) (internal quotation marks omitted).

For the purposes of Title VII, "[a] tangible employment action constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998). "A tangible employment decision requires an official act of the enterprise, a company act. The decision in most cases is documented in official company records, and may be subject to review by higher level supervisors." *Id.* at 762.

Broussard argues that the RIF transfer constituted a tangible employment action. A transfer can amount to a demotion or constructive discharge if it is "akin to acts such as hiring, granting leave, discharging, promoting, and compensating." *Burger v. Cent. Apartment Mgmt., Inc.*, 168 F.3d 875, 879 (5th Cir. 1999) (internal quotation marks omitted). Documented reprimands and transfer decisions unaccompanied by changes in salary, benefits, or job duties do not, however, qualify as tangible employment actions. *Felton v. Polles*, 315 F.3d 470, 487 (5th Cir. 2002); *Burger*, 168 F.3d at 879. As Judge Posner, writing for the Seventh Circuit Court of Appeals, has explained:

> Obviously a purely lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action. A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either. Otherwise every trivial personnel action that an irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit. The Equal Employment Opportunity Commission, already staggering under an avalanche of filings too heavy for it to cope with, would be crushed, and serious complaints would be lost among the trivial.

8

*Williams v. Bristol-Meyers Squibb Co.*, 85 F.3d 270, 274 (7th Cir. 1996), *quoted in Burger*, 168 F.3d at 879.

Broussard contends that the TDCJ, by assigning him to his fifteenth-choice location and then to a facility in the vicinity of his seventh-choice location, subjected him to a round-trip commute of hundreds of miles per day, effectively forcing him to resign. Under circumstances nearly identical to these, however, the Fifth Circuit has found that a transfer did not constitute a constructive discharge. *See Hill v. K-Mart Corp.*, 699 F.2d 776, 779 (5th Cir. 1983) (affirming summary judgment for the defendant on the plaintiff's constructive discharge claim, which arose from her transfer from Pine Bluff, Arkansas to Jackson, Mississippi, a move of more than 200 miles). Broussard acknowledges that his transfer did not involve a reduction in pay or benefits or a significant change in job duties. In the absence of such circumstances, *Hill* requires the Court to find that the transfer did not constitute a constructive discharge.

Broussard also argues that the RIF violated Title VII because of its disparate impact on African Americans. To establish a *prima facie* disparate impact claim, the plaintiff must show "that the employer's facially neutral . . . standards [operate] in a significantly discriminatory pattern." *Banks v. East Baton Rouge Parish Sch. Bd.*, 320 F.3d 570, 578 (5th Cir. 2003). The TDCJ points out that the RIF did not impact African American chaplains in any statistically significant respect, as compared to Caucasian chaplains. Broussard, however, objects to the inclusion in such a calculation of two African American, Muslim chaplains, who were not transferred in the RIF due to their senior status. According to Broussard, in the 1980s, when these two chaplains were hired, the only Muslims in the TDCJ system were Black Muslims. The TDCJ thus had

9

no choice but to hire African Americans for the Muslim chaplain positions, and hence, Broussard argues, these chaplains were too senior in 2003 to be affected by the RIF.

While the Court concedes the possibility that the TDCJ's hiring practices in the 1980s may have been tainted by racism and that, as a result, the TDCJ may at that time have hired African Americans only when no other options were available, those alleged hiring practices are not the subject of this lawsuit.  Nor is Broussard claiming that the TDCJ engaged in religious discrimination – that is, that the TDCJ wished the RIF to affect Christian and Muslim chaplains differently.  His only claim is that the TDCJ structured the RIF in such a way as to disadvantage African Americans, and he has failed to refute the TDCJ's statistical evidence disproving such a claim.  Accordingly, the Court hereby **GRANTS** summary judgment for the TDCJ on Broussard's discrimination claim.

### 2. The Retaliation Claim

Title VII also makes it "an unlawful employment practice for an employer to discriminate against any of [its] employees . . . because [the employee] has opposed any practice made an unlawful employment practice by this subchapter . . . ." 42 U.S.C. § 2000e-3(a).  "A plaintiff establishes a *prima facie* case [of] unlawful retaliation by proving (1) that [he] engaged in an activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse employment action." *Grimes*, 102 F.3d at 140.  Here, Broussard has not pled or provided any evidence that he engaged in activity protected by Title VII prior to filing the EEOC charge that gave rise to this suit.  Accordingly, he has failed to establish a *prima facie* case of retaliation, and the Court therefore **GRANTS** summary judgment for the TDCJ on that claim.

### 3. The Hostile Work Environment Claim

Finally, Broussard claims that the TDCJ subjected him to a hostile work environment by repeatedly failing to discipline Larsen or respond adequately to the three internal grievances that Broussard filed in late 2002 and early 2003. Under Title VII, a plaintiff claiming a hostile work environment must demonstrate that his workplace is "permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted).

> A *prima facie* case of racial harassment alleging hostile work environment normally consists of five elements: (1) the employee belongs to a protected group; (2) the employee was subjected to unwelcome harassment; (3) the harassment complained of was based on race; (4) the harassment complained of affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment in question and failed to take prompt remedial action.

*Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 353 (5th Cir. 2001). Where a plaintiff alleges hostile work environment harassment by a superior, the fifth prong is automatically met. *Id.* at 354.

Title VII imposes a 300-day limitation period for filing charges of discrimination with the EEOC, 42 U.S.C. § 2000e-5(e)(1), and the TDCJ contends that that provision precludes Broussard from asserting, as support for his hostile work environment claim, any event occurring before September 21, 2002. Broussard argues, however, that the 300-day limitation period does not apply to his claim, which alleges one continuous

violation beginning with Defendants' very first discriminatory act and culminating in Broussard's transfer.

"The continuing violation theory relieves a plaintiff of establishing that all of the complained-of conduct occurred within the actionable period if the plaintiff can show a series of related acts, one or more of which falls within the limitations period." *Celestine v. Petroleos de Venezuella SA*, 266 F.3d 343, 351 (5th Cir. 2001). "However, the continuing violations doctrine does not automatically attach in hostile work environment cases, and the burden remains on the employee to demonstrate [that] an organized scheme led to and included the present violation." *Id.* at 352. In determining whether a continuing violation exists, the Court asks three questions:

> (1) Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? (2) Are the alleged acts recurring or more in the nature of an isolated work assignment or incident? (3) Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights?

*Id.* The continuing violation theory requires that the acts occurring within the limitations period be of the same sort as those that took place outside of the period and that the acts be similar to one another:

> Given [the] various restrictions on use of the continuing violation doctrine, the burden is upon [Plaintiff] to offer evidence that [he] suffered race-based harassment both prior to and during the filing period, that the incidents of harassment were related, and that the harassment was pursuant to an organized scheme.

*Id.* at 353. The Court looks to the totality of the circumstances, including "the frequency of the conduct, its severity, whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with [the] employee's work performance." *Id.* at 113.

Here, Plaintiff complains that TDCJ management improperly resolved his grievances and countenanced repeated interruptions of his religious services by prison guards. He also alleges that Larsen's inadequate performance, hostility, and refusal to cooperate with Broussard contributed to the hostile environment. Even were the Court to find, however, that all of these events were related, such that those occurring outside of the 300-day period may properly be included under a continuing violation analysis, the TDCJ's alleged actions do not rise to the level of a hostile work environment.

The essence of Broussard's claims appears to be that the TDCJ discriminated against African Americans in general, via the RIF, and against Broussard in particular, by failing to discipline and/or discharge Larsen. As explained above, the TDCJ has produced statistical evidence to rebut the first allegation. And, as the Fifth Circuit stated in *Fentroy v. Dillard Texas Operating Ltd. P'ship*, 2001 WL 1485798 (5th Cir. Nov. 8, 2001),[3] the second contention may serve as the basis for a claim of disparate treatment but not of a hostile work environment.

In *Fentroy*, the plaintiff's summary judgment evidence established that her employer disciplined her more harshly than similarly situated Caucasian employees, demoted her upon her return from medical leave while permitting Caucasians returning from such leaves to return to their previous positions, instructed subordinates not to hire African American workers, and paid Caucasians more and promoted them more frequently than African Americans. *Id.* at *2-*3. The Fifth Circuit noted that facts such as these could establish a *prima facie* case of disparate treatment discrimination but could not support a hostile work environment claim, because "no evidence exist[ed] that [the

---

[3] This unpublished decision is persuasive, but not binding, precedent. It is, however, instructive as to the Fifth Circuit's approach to claims such as Broussard's.

13

plaintiff] was subjected to racially discriminatory intimidation, ridicule or insult" or that any racial epithets had been directed at her. *Id.* at *3.

Similarly, in this case, Broussard argues that Larsen was given preferential treatment because he is Caucasian and that Broussard's complaints were not adequately addressed because he is African American. He also argues that, at about the same time as Larsen's arrival, the guards began more frequently to interrupt Broussard's religious services to perform security and administrative functions.[4] He does not claim that any racial epithet or other explicitly racist behavior was directed at him or, with the possible – though remote – exception of Larsen's one alleged tantrum, that he was physically threatened in any way. In sum, his real complaint is that he was subjected to poorer treatment and more harshly dealt with than his Caucasian coworker. This is a quintessential disparate treatment claim.

A disparate treatment claim, however, is colorable only if it is based upon a tangible employment action. *See Felton*, 315 F.3d at 486-87 (noting that, while this area of the law is still evolving, *Dollis v. Rubin*, 77 F.3d 777 (5th Cir. 1995), which remains valid and binding precedent, applied the requirement to both retaliation and disparate treatment claims). Broussard's claim does not involve a tangible employment action, as the TDCJ acts complained of are not "akin to acts such as hiring, granting leave, discharging, promoting, and compensating." *Burger*, 168 F.3d at 879 (internal quotation marks omitted). Accordingly, the Court **GRANTS** summary judgment for the TDCJ on Broussard's hostile work environment and implicit disparate treatment claims.

---

[4] Broussard's contention that these interruptions were motivated by his race is oblique, at best. The thrust of his argument appears to be that Larsen's arrival catalyzed previously latent racism within the TDCJ. Even if Broussard is correct, however, the guards' alleged harassment simply was not severe enough or explicitly race-based enough to satisfy the requirements of a hostile work environment claim.

### D. The Individual Defendants' Motion for Summary Judgment

Defendants Medart and Starliper argue that Broussard's claims against them fail for lack of subject matter jurisdiction. All individual Defendants[5] argue that Broussard cannot overcome their qualified immunity and, in any event, has not stated a claim of retaliation, disparate treatment, disparate impact, or hostile work environment against them under § 1983. The Court addresses each contention in turn.

#### 1. Medart's jurisdictional challenge

The original Complaint in this case was filed on March 17, 2004. FED. R. CIV. P. 4(m) provides that the Court must dismiss an action without prejudice as to any defendant who is not served with copies of the Summons and Complaint within 120 days of the filing of the Complaint. Medart contends that he was not timely served and, therefore, that Plaintiff's claims against him should be dismissed.

Broussard asserts that, when he initially attempted to serve Medart via certified mail at the TDCJ, Medart had already ended his employment with the TDCJ and had left no forwarding address. Medart was finally served on August 6, 2004. Broussard complains that Medart should not be rewarded for resisting service and should not be permitted to object to personal jurisdiction after filing his Answer or other general appearance.

At the outset, the Court notes that Medart included his objection to personal jurisdiction in his Answer to Broussard's First Amended Complaint. The jurisdictional argument was not, however, raised in Defendants' Rule 12(c) joint motion for judgment

---

[5] Plaintiff concedes that no § 1983 claim may be asserted against the TDCJ.

15

on the pleadings, Docket No. 26, in which Medart joined.  Rule 12(g) provides that "[a] party who makes a motion under [any section of Rule 12] may join with it any other motions herein provided for and then available to the party."  FED. R. CIV. P. 12(g).  And Rule 12(h)(1)(A) states that a defense of lack of personal jurisdiction is waived "if omitted from a motion in the circumstances described in subdivision (g) . . . ."  FED. R. CIV. P. 12(h)(1)(A).  The jurisdictional defense was obviously available to Medart at the time of the Rule 12(c) motion for judgment on the pleadings, as that motion was filed after Medart's Answer.  Accordingly, Rule 12(h)(1) mandates a finding of waiver, and Medart's motion for dismissal on jurisdictional grounds is therefore **DENIED**.

### 2. Starliper's jurisdictional challenge

Broussard's original Complaint did not assert claims against Starliper, who was added as a Defendant in Broussard's first amended Complaint, Docket No. 21, which was filed on August 6, 2004.  Starliper concedes that he was served with copies of the Summons and first amended Complaint in September 2004, well within the 120-day time limit established by FED. R. CIV. P. 4(m).  Accordingly, Starliper's motion to dismiss on jurisdictional grounds is **DENIED**.

### 3. Qualified Immunity

Qualified immunity is "an *immunity from suit* rather than a mere defense to liability . . . ."  *Saucier v. Katz*, 533 U.S. 194, 200-01 (2001) (internal quotation marks omitted; emphasis in original).  In undertaking the threshold inquiry whether the individual Defendants are entitled to qualified immunity, the Court asks the following question: "Taken in the light most favorable to the party asserting the injury, do the facts alleged show [that] the [Defendants'] conduct violated a constitutional right?"  *Id.* at 201.

16

In his Second Amended Complaint, Broussard avers generally that Defendants violated his constitutional rights by giving Larsen preferential treatment, harassing Broussard, transferring Broussard during the RIF, and lodging disciplinary complaints against him after the transfer.

A plaintiff may, of course, assert both Title VII and § 1983 claims in a single suit, if the facts alleged establish violations both of Title VII and of one or more independent constitutional or statutory rights. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1573 (5th Cir. 1989) ("Title VII is the exclusive remedy for a violation of its own terms.  But when a public employer's conduct violates both Title VII and a separate constitutional or statutory right, the injured employee may pursue a remedy under § 1983 as well as under Title VII.") (emphasis omitted).  For instance, an employee who was fired in retaliation for testifying at an Equal Employment Opportunity ("EEO") hearing may sue under both Title VII, on a claim of retaliation for protected conduct, and § 1983, on a claim of infringement of the independent First Amendment right to testify. *See id.* at 1576.

Relying on First Amendment cases like *Johnston*, the individual Defendants in this case argue that, because Broussard has not pled the violation of a First Amendment right, his § 1983 claim cannot survive beyond summary judgment.  (*See* Defs.' Mot. for Summ. J. at 22.)  The *Johnston* holding is not, of course, so limited.  Broussard may base his § 1983 claim on the alleged violation of *any* constitutional or statutory right (excepting only Title VII itself).

In Broussard's Second Amended Complaint, he invokes the due process and equal protection clauses of the Fourteenth Amendment.  (*See* 2d Am. Compl. at 24.)  He does

17

not, however, explain, in either the Complaint or his response to the motion for summary judgment, *how* Defendants' actions violated his right to due process of law or to the equal protection of the laws.  Broussard has provided no citations to constitutional provisions, statutes, or precedents that support his due process and equal protection claims.

While it is true that an employment contract constitutes property, the deprivation of which may give rise to a due process claim, *see Mallek v. City of San Benito*, 121 F.3d 993, 998 (5th Cir. 1997), Broussard has not pled or otherwise asserted that any such contract existed.  Even were the Court to find that Broussard did possess a property interest in his continued employment, the fact remains that the TDCJ did not terminate his employment; Broussard resigned, and the Court has found that the circumstances surrounding his resignation did not render it a constructive termination.  Moreover, the Fourteenth Amendment does not give rise to a right not to be harassed while at work, or a right to competent and cooperative coworkers.  Accordingly, because Broussard has not pled the violation of a legitimate, non-Title VII constitutional or statutory right, he cannot defeat Defendants' assertion of qualified immunity.  The Court therefore **GRANTS** summary judgment for the individual Defendants on Broussard's § 1983 claims against them.

### III.   CONCLUSION

Broussard has failed to establish a *prima facie* case of employment discrimination under Title VII, because he has not demonstrated that he suffered a tangible employment action, that the TDCJ treated African Americans and Caucasians differently, or that the TDCJ's facially neutral actions had disparate impacts on African Americans and Caucasians.  He has not shown that he engaged in protected activity, a necessary element

18

of his Title VII retaliation claim, or that Defendants' actions were severe and frequent enough to constitute a hostile work environment. Finally, he has failed to plead facts demonstrating any violation of an independent constitutional or statutory right sufficient to support a § 1983 claim against the individual Defendants. Accordingly, all of Broussard's claims are hereby **DISMISSED WITH PREJUDICE**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 30th day of May, 2006.

*[signature]*

KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**