UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| FRED D. BROUSSARD, § | |
| § | |
| Plaintiff, § | |
| VS. § | |
| § | CIVIL ACTION NO. H-04-1059 |
| TEXAS DEPARTMENT OF CRIMINAL § | |
| JUSTICE, *et al.*, § | |
| § | |
| Defendants. § | |

## MEMORANDUM AND ORDER

Pending before the Court in this employment discrimination case is Plaintiff Fred Broussard's motion, pursuant to FED. R. CIV. P. 59(e), for reconsideration of the Court's Memorandum and Order and Final Judgment dated May 30, 2006, which granted summary judgment for Defendants on all of Broussard's claims. After considering Broussard's motion and the applicable law, the Court finds that the motion, Docket No. 68, should be and hereby is **DENIED**.

A motion for reconsideration may not be used to rehash rejected arguments or to introduce new ones that could have been offered earlier. *See, e.g.*, *LeClerc v. Webb*, 419 F.3d 405, 412 n.13 (5th Cir. 2005). Reconsideration is, rather, an unusual remedy that should be used sparingly. *Id.* Here, Broussard argues that (1) the Court improperly relied upon *Hill v. K-Mart Corp.*, 699 F.2d 776 (5th Cir. 1983) in finding that Broussard was not constructively discharged, and (2) the Court erred in refusing to consider the past hiring practices of Defendant Texas Department of Criminal Justice ("TDCJ") or to adopt

1

Broussard's, rather than the TDCJ's, statistical analysis of the reduction in force ("RIF") that gave rise to this suit. The Court evaluates each contention in turn.[1]

## I. THE *HILL* CASE

Broussard insists that racial discrimination is no longer so overt as it once was and, therefore, that the Court must search for fine nuances and levels of meaning in facially neutral actions and circumstances. While Broussard's characterization of modern racism does, no doubt, accurately describe some cases, a Title VII plaintiff must nonetheless – in *every* case – bear his burden of demonstrating both a tangible employment action and evidence of discriminatory motive. In *Hill*, the Fifth Circuit upheld the trial court's finding that the plaintiff had not borne that burden.

In its May 30 Order, the Court found that the facts of this case are virtually identical to those of *Hill*. Broussard's motion for reconsideration sets forth fourteen supposed distinctions between *Hill* and the instant case, arguing that these differences require the Court to allow Broussard to submit his claims to a jury. The Court's evaluations of these attempted distinctions are as follows:

> "a. Hill had a history – from shortly after August 1975 to fall 1976 – of disagreements and co-worker problems over a period of time with several employees." (Pl.'s Mot. for Reconsideration at 3.)[2]
>
> As he himself argued in his Complaint, which was incorporated by reference in his response to Defendants' summary judgment motion, Broussard had a lengthy history of conflicts with his co-chaplain and a

---

[1] After the Court granted summary judgment for Defendants in this case, the United States Supreme Court issued its opinion in *Burlington N. & Santa Fe Ry. Co. v. White*, No. 05-259 (June 22, 2006), holding that Title VII retaliation claims are not subject to the stringent "ultimate employment action" standard applicable to discrimination claims. As this Court explained in its May 30 Memorandum and Order, Broussard's retaliation claim failed because he did not assert a key element of the *prima facie* case – namely, the requirement that a plaintiff show that he engaged in activity protected by Title VII. Accordingly, the *Burlington Northern* case does not alter this Court's analysis or resolution of Broussard's retaliation claim, which the Court therefore declines to reconsider.

[2] Each lettered section is quoted from Broussard's motion. The Court's response to each appears directly below the lettered excerpt.

2

record of repeated clashes with prison guards.  (*See* 2d Am. Compl. at 7 ¶ 21 – 11 ¶ 33.)

"b.  In each circumstance, the management representative [in *Hill*], McDaniel, made a creditable effort to alleviate the problems – recommending the other employee's termination on at least two occasions."

In actuality, the Fifth Circuit stated in *Hill* that "the handling of the incidents of racial remarks left something to be desired" and that, in both incidents involving racial slurs, McDaniel had "based his disciplinary decision on grounds other than racism or insubordination and, in one of the instances, allowed the offending employee to remain employed after ordering her dismissed."  699 F.2d at 778.  Similarly, in this case, TDCJ supervisors made some attempts to have Larsen, the offending co-chaplain, transferred in response to Broussard's complaints, despite the lack of evidence that Larsen's behavior was motivated by racism.

"c.  On the third occasion of Hill's inability to get along, the other employee was perhaps equally ornery but seemed to have a 'charmed existence.'  Unlike Hill (and unlike Larsen in the instant case)[,] McDaniel considered this other employee (Brooks) 'a valued employee, crediting the plant department's notable success to [his] experience and creativity.'"[3]

In fact, as the *Hill* opinion makes clear, Brooks's existence was said to be "charmed" because he "was noted for his on-going confrontations with assistant managers – black and white, male and female – and his persistent ability always to come out on top."  *Id.*  In other words, Brooks was, in this crucial respect, identical to Larsen.

"d.  Nonetheless, to appease Hill yet another time, McDaniel took action to separate her from Brooks.  Still, within six months, Hill had further complaints against Brooks that 'he was watching her while she supervised a sidewalk sale.'  It turned out that Brooks had been temporarily pressed into surveillance and security duty by the management – he was simply doing his job (a statement which could seldom be made about Larsen in the instant case)."

In actual fact, as is evident from Broussard's accurate description of these *Hill* allegations, McDaniel's efforts to separate Hill and Brooks were futile, as management continued to assign Brooks to work in areas where Hill was detailed.  Moreover, McDaniel's way of separating the two employees was to transfer *Hill* ("the assistant manager," *id.*) – not Brooks – to another area.

---

[3] First alteration added; second in original.

"e. The actions and conduct of Brooks towards Hill were deemed by the court to be no evidence of actionable discrimination where Brooks 'apparently treated all assistant managers equally – with measured disdain.[']"

It is apparent from Broussard's Complaint that Larsen treated all TDCJ management and rules with equal contempt. (*See* 2d Am. Compl. at 7 ¶ 21 – 11 ¶ 33.) Moreover, there is no evidence that the interruptions of religious services by guards were targeted at Broussard alone. And, as in *Hill*, the record does not "support a finding that these isolated incidents resulted in an atmosphere charged with racist overtones and racial tension." 699 F.2d at 778.

"f. Hill was transferred from Pine Bluff to Shreveport, and after 21 months at that station, from Shreveport to Mississippi."

The Court is unsure of the intended import of this information. Certainly the specific locations involved in the two cases are different. The Court notes, however, that Pine Bluff and Shreveport are 249.6 miles apart and, thus, that Hill's round-trip commute after the first transfer would have been more than 500 miles.

"g. It was the practice of Hill's employer to 'rotate' management personnel in and out of markets, Hill was obviously aware of this, and had accepted such rotation in the past. It was customary for assistant managers (such as Hill) to be routinely transferred after serving 18-24 months in a store."

While the TDCJ did not have a standard practice of rotating chaplains, it transferred Broussard as part of a system-wide reduction in force ("RIF") conducted according to neutral standards that actually preserved the jobs of more African American chaplains than Broussard's preferred approach would have. Moreover, there is no evidence to indicate that Broussard had a right to a position at a particular location, and the TDCJ certainly was not estopped from transferring him merely because it had not done so before.

"h. At the time of her rotation out of Shreveport and into Jackson, another employee (White male) with equal time at the Shreveport store was also rotated out."

Many Caucasian chaplains were transferred or laid off during the RIF. While no Caucasian at Broussard's facility was affected, Broussard has established no basis upon which the Court may or should view the events at Broussard's facility in a vacuum, disregarding the broader impact of the system-wide RIF.

4

"i. Unlike the instant case, Hill declined the transfer and instead, [sic] wrote to the Lynch, [sic] Regional Personnel Manager requesting 'a "resident" assistant manager position in the Pine Bluff store.' [Evidently, she was seeking to return to her home base and requested a transfer to suit her own personal convenience only.][4] Lynch tried to accommodate Hill by making inquiries and even recommending her (warts and all) to the Arkansas region manager."

Broussard's only articulated objection to the transfer is that it required him to commute for hundreds of miles both to and from work. (*See* 2d Am. Compl. at 8 ¶ 25.) His aversion to the long commute presumably arises from his concern for his own personal convenience. Hill's desire to work near her home is indistinguishable from Broussard's wish to do the same. In addition, when Broussard complained about his initial transfer, the TDCJ – like Hill's employer – attempted to mitigate the inconvenience; indeed, while Hill's employer was ultimately unable to secure employment for Hill nearer to her home, Broussard was offered (and accepted) a position much closer to his original posting.

"j. Hill had not proved that the several incidents of disagreement with others 'had any significant impact on her position or authority.' The trial court's record showed that even though Hill endured racial slurs (a circumstance[ ] which management promptly addressed by co-worker separation), she suffered no lack of respect or dignity, despite her conclusional [sic] claims to the contrary."

As noted above, the racial harassment endured by Hill was more severe than that alleged by Broussard – and Broussard is correct in stating that the Fifth Circuit held that even such explicitly racist treatment did not rise to the level of a hostile work environment. Also, and as previously noted, the "co-worker separation" in *Hill* consisted of the transfer of Hill herself.

"k. Most of the incidents of which Hill complained had occurred long before her resignation, unlike the instant case where Plaintiff recognized and documented the transfer problem to superiors promptly. Unlike Hill, he was singled out for a particularly onerous move of more than 600 miles (unlike any other person transferred because of the RIF). Further, this station was his 15th choice, the worst of all choices granted to any employee transferred because of the RIF."

Most of the incidents of which Broussard complains occurred long before his resignation. Indeed, his motion for reconsideration urges the Court to find colorable discrimination claims on the basis of hiring policies allegedly employed by the TDCJ in the 1980s and 1990s. Hill, like

---

[4] Final bracketed material in original.

Broussard, complained of each alleged slight at the time that it occurred. And, contrary to Broussard's implication, Hill filed her discrimination charges with the Equal Employment Opportunity Commission ("EEOC") within two weeks of her resignation. *Hill*, 699 F.2d at 777. Broussard himself waited a month after the announcement of the RIF to file his own charge. (*See* Pl.'s Resp. to Defs.' Mot. for Summ. J. at 11 (stating that the RIF was implemented in June 2003); Memorandum and Order dated May 30, 2006 at 6 (noting that Broussard filed his EEOC charge on July 21, 2003).)  Finally, Broussard ignores the fact that the RIF inevitably impacted some employees more severely than others, because some job locations are simply more desirable than others. Some TDCJ employee was bound to be assigned a selection lower on his list than did anyone else. That fact alone is, of course, insufficient to demonstrate deliberate discrimination.

"l. Unlike the instant Plaintiff, Hill's true reason for objecting to her move was the convenience of her family. She was at home with the idea of being rotated or transferred – it was the routine and custom of her employer to rotate managerial staff – and she had not complained about her prior move to Shreveport, because it was not as inconvenient a move for her."

This argument is identical to that made in paragraph i, above, and the Court hereby incorporates by reference its response to that paragraph.

"m. Hill had not availed herself of the employer's internal grievance procedures, such as Plaintiff did. Even[ ] so, the instant Court found that Plaintiff had never made a claim of racial discrimination prior to filing his EEOC charge. Plaintiff, a lay person, had every right to believe that when he filed his grievances with the EEO office of his employer he was alerting Defendants of [sic] discrimination. Yet, unlike the Defendants in *Hill*, they did nothing except pay lip service and make promises."

Plaintiff does not claim to have filed any EEOC charge prior to the one that gave rise to this suit. His previous internal complaints are not equivalent to EEOC charges and do not exhaust the requirement that such a charge be filed and a right-to-sue letter issued before a Title VII claim may be stated in court. Plaintiff has, of course, a right to believe whatever he likes – but he (and his counsel) have a duty to apprise themselves of the applicable law before asserting, in signed pleadings and motions, claims to which Broussard is not entitled.

"n. Most importantly, the difference between these two cases is that, even with scant facts to support her position (in light of her strained interactions with multiple employees)[,] Hill was afforded her day in court, and given an opportunity to develop her evidence. The instant case is far better."

6

The instant case is factually indistinguishable from *Hill*, except insofar as Hill received more obviously racist treatment. The Court is not obliged to try the same case over and over again once the Fifth Circuit has held that an identically situated plaintiff does not have a compensable claim. That is the meaning and the value of precedent.

In sum, the asserted differences between *Hill* and this case are at best illusory. Notwithstanding their insufficiency, the Court has taken the trouble to address each separately and, therefore, trusts that Broussard will not seek to revisit these issues again in this forum.

## II.   PAST HIRING PRACTICES

Broussard also argues that the TDCJ's alleged[5] pre-1997 hiring practices were racially discriminatory and resulted in the 2003 RIF's impacting Caucasians and African Americans differently. He does not explain how Title VII entitles him to assert claims in 2004 based upon events occurring, at the latest, in 1997, nor how he can evade the 180-day time limit for filing an EEOC charge arising from those events. Broussard's counsel, who has been practicing law for more than twenty years,[6] is obviously aware of the time limitations imposed by Title VII, and the Court cautions Ms. Mutope-Johnson that arguments such as this one can and do result in sanctions.

Finally, Broussard urges the Court to evaluate the racial impact of the RIF not upon all chaplains subject to it but, rather, upon only those chaplains who were eligible for transfers under the RIF. Broussard has provided the Court with no reasoning or evidence to support the arbitrary exclusion of the employees who suffered the worst

---

[5] Broussard's Complaint does not actually contain any factual allegations concerning the TDCJ's hiring policies. (*See* 2d Am. Compl. at 1-14.) In the interest of a complete analysis, however, the Court addressed the contentions regarding those policies in its May 30 Order and addresses them once again – and for the last time – today.

[6] *See The Law Offices of Ayesha G. Mutope-Johnson*, http://www.amutope.com.

7

consequences of the RIF – those who lost their jobs entirely. Accordingly, the Court declines to adopt Broussard's selective and self-serving categorization.

### III. CONCLUSION

Broussard has failed to demonstrate that either the reasoning or the conclusions contained in the Court's May 30, 2006 Order were in error, and his motion for reconsideration is therefore **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 26th day of June, 2006.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE

**TO INSURE PROPER NOTICE, EACH PARTY WHO RECEIVES THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH THEY MAY HAVE BEEN SENT ONE BY THE COURT.**